Lisa Ann and the attorney for the appellant is Jane Kowalski, correct? Yes, your honor. You may proceed, ma'am. You may proceed, ma'am. And I just want to take a moment before my road map to compliment Mr. Douglas on his professionalism and his civility, and he has been a great assistance to me in all these procedural matters before this court, and I thank him for that. Your honor, the nature of the case before you today is limited to two issues. It's whether the trial court erred in finding that the PE was no longer entitled to maintenance from the payor because she was engaged in a resident continuing conjugal relationship. And that's pursuant to statutory section 7510C of the Illinois Marriage and Dissolution Marriage Act. And the second issue is whether the court erred in holding my client, the payor, in contempt based upon a sui sponte interpretation of the July 20, 2005 order, and then entering a judgment in excess of $100,000 on its revised interpretation of that order. Now, the standard of review on the first issue as to the resident continuing conjugal relationship is whether the trial court's decision was against the manifest weight of the evidence. And we define manifest weight of the evidence, we would have to find that an opposite conclusion, the one drawn by the trial court, was clearly apparent, correct? Yes, your honor. So it's a fairly deferential standard of review, is it not? Yes, it's a difficult standard for the payor to meet, especially in this case when the payee resided in North Carolina and the third party paramour concubine, I don't know how to politically correctly say this, the third party partner, also resided in the state of Washington. So it's an especially difficult burden for my client to meet. But one of the factors that the court has to look at in giving deference to the trial court is the absence of evidence. And a reviewing court can consider the improperly excluded evidence in determining whether the trial court's ruling was against the manifest weight of evidence. And I'm relying upon N. Ray, Mayor Jim Gordon for that. The improperly excluded evidence? Yes, your honor. We had sought evidence as to the payee residing in North Carolina and the third party significant other partner residing in the state of Washington. We sought the Google records because they were communicating by Gmail. No less than three orders were entered requiring the parties to cooperate to tender the records. We were never provided with the records from Google. Instead, one of the exhibits consists of a CD that was produced by the third party at his deposition. And that contains quite literally doctored e-mails. It was admitted that they were doctored. For instance, phone numbers were redacted from the e-mails. Did you make an offer of proof as to what that was going to show? Your honor, there were e-mails that were admitted. And the ones that were admitted showed, for instance, a Valentine's Day greeting, pictures of fluffy snow and Washington state, pictures of a joke about how men refer – it was a joke about men fixing things. For instance, there's a picture of a knife attached to a fork, which was supposed to act like a spoon. And that was kind of a funny joke that they shared. And these were the e-mails that we did provide. And there were three court orders, and we did motion up twice for compliance with these orders so that – What was this going to show relative to the issue? And I think, obviously, honing in on the statutory language, you all know it's a resident, quote-unquote, tangible basis. What evidence is there that the two of them ever recited together some kind of a resident ongoing basis? Is there any evidence that they recited in the same household? Yes, your honor, there was. What is that evidence? The evidence was back in – I'm going to have to check exactly the dates on my record – but for a short time, for six months, they resided in the same residence, at which point the paramour moved a few miles away. But he also testified in his evidence deposition that he drove to her house every day. There's also evidence from people that were at the neighboring real estate association that they went to lunches together. That's my difficulty, is that after living in the same community and talking to each other for hours on the phone on a daily basis, that one of the spouses moved away. But even – one of the, I should say, paramour moved away. But even though they're residing in different states, can you have a continuing conjugal relationship? In today's society, I believe you can, and that's because there's Gmail. We've admitted to evidence the phone records. The phone records demonstrated that these two, the payee and the significant other, spoke daily for 120 minutes. I don't speak to my significant other for 120 minutes. How does that establish you're living together? Your honor, the actual residence together is not demonstrated by the record. Matter of fact, that was the joke at the beginning of this case. You can't show a resident continuing conjugal relationship because they live in different states. Well, now, because of Skype and Google and email and phone conversation and frequent flyer points, you can continue to have a resident continuing conjugal basis. How is there a conjugal relationship between two people living in different states? Well, your honor, they were – How was Skype established then? Conjugal relationship? Your honor, they admitted to conjugal relationships when they were living together. And there was also evidence in the record – mind you, this was a July 12 hearing – and that he had recently flown in from – in November of 2011, I believe, to visit her in North Carolina from the state of Washington. But – The trial court – there's six different factors to consider, right? Yes, your honor. The trial court found one of those six to go basically to – they found it in your favor, correct? Yes, your honor.  Yes, your honor. The others, the amount of time they spend together, the kind of activities they engage in, their commingling of their personal affairs or the relationship of their personal affairs, whether they vacation, whether they have holidays together, all of those others he found weighed in the ex-husband's favor, correct? Weighed in the wife's favor for the continuation of the maintenance, yes. Yes. Of those other five, give me your best one or two. What do you think? I actually presented evidence as to all of them. I realize that there was some evidence presented as to all of those, but I think you would have to admit, wouldn't you, that some of them are weaker than others, some of your arguments? Give me your stronger arguments on the one or two others. Maybe I should give you my weaker ones, but do you want the stronger ones? Sure. The interrelationship of their personal affairs. One of the big factors that the court has to look at is the nature of the relationship. Yes, those are factors for the court to consider, but it really is the nature of the relationship, and that's from the Weisberg case. The focus is on the economic realities, and that's why in Weisberg's case the court looked at whether there was a life insurance, whether there was a retirement interest that the person was a beneficiary of. And we do have that in this case. As a matter of fact, the significant other at his evidence deposition in Washington testified that the payee was the beneficiary of his life insurance policy. There was also properties that they jointly owned as joint tenants with rights of survivorship, not just business partners, not just key name insurance, because there was a claim that they were business partners. There was a claim that he paid her... But if there is not a business relationship, it essentially in North Carolina is treated as a tenancy in common. Well, when you made reference to the fact that it was a business relationship and it was a right of survivorship, that's like saying that the dog is rabid because it happens to be a dog and it is white. I mean, I don't see how the fact that there's a business relationship and that it relates to a right of survivorship proves anything about an intimacy and relationship because it would apply across the board to anybody, meaning heterosexual men who are in the same business. If they have the same clause, it will apply the same. So it doesn't really... Unless, of course, you're claiming that there is no business relationship between these people. That's correct, Your Honor. There is no business relationship between these two parties. These people weren't working together in a business? At some point they claimed to have been. Well, they claimed it in the trial court so fine? Yes, Your Honor, but in determining whether the trial court erred, one of the factors you have to look at is the fact that wife solely declared a sole proprietorship on her tax return. She also claimed that I asked her what car she drove. She drove his car. She didn't admit that. When I confronted her with her tax return, which showed that she depreciated his Bronco, then she had acknowledged that, oh, yeah, I do drive his car. But these are just one of the factors that the court has to look into. But I agree with you absolutely. If the facts just show that it was joint tenancy with right of survivorship with one property, you might be right. But what we're looking at here is the nature of the relationship. And, of course, over the last 10 years, boy, relationships have really changed in this data going on. But 510C still governs them, whether it's a civil union or heterosexual or homosexual. You have the life insurance. You have other indicia of this relationship. But did they ever commingle their finances in joint checking accounts, daily expenses? Did they have bank accounts together? Bank accounts together, no. However, each and every month, the paramour provides her $375. There's no joint account. That's it. They explain that as rental. Right. But it's the rental for business that he claims he owns but is solely on her tax return. It seems to me as though, see, part of the problem is that I bear very heavy burden of proof. But at a certain point, there's a burden of production. I've presented evidence that, for instance, they travel to nearby counties for poverty festivals, for concerts, for pleasure travel. The court found, no, that there's no evidential vacations in that way against me. Well, I think once I've met as the payor spouse who is in Illinois, I think there's a burden of production, that the payee has to present some evidence that, no, I vacation with other people, whether it's myself or with my daughter. You can't just once I have evidence presented that there's joint pleasure travel. I mean, technically, under one of the factors, it's a vacation. Well, did you establish joint pleasure travel or just joint travel? I believe it was joint pleasure travel. They were going to pottery festivals, which I don't think was related to any business. I went to a judicial conference with a fellow colleague of mine, and although I will admit that it was enjoyable, it wasn't necessarily a pleasure trip. It was a trip. And I thought that they suggested in the trial court, I thought also said it believed them that these trips, most of them, were for business purposes. I can't imagine how going to a pottery festival and or a concert would be for business. You're talking about the exception of the rule. I'm talking about the other trips or the vacations, if you want to call them vacations. They went to another county for a county fair. I mean, these are people that are in their late 50s. There's no fun just vacations. But I think once I present some evidence of joint travels, the burden of production has to shift. Of course, I meet the burden of persuasion, which is so hard for a payor's spouse. But you have to give me the benefit of the doubt on this one. You're doing a nice job of referring to the burden of production and then the necessity to respond. But you haven't really said anything about the deference that we are supposed to give to the trial court's findings on credibility. And when you couple that with the manifest way to the evidence, the issue of response to production or your going forward seems to be subordinated to the other two legal criteria or principles. In other words, please explain how if the trial court is making findings of credibility and we're supposed to give deference to it, how does your claim that you've made production overcome that rule of appellate review? Well, I think the key thing that I requested production. I requested all the Google emails. I only got some. I also requested the presentation of her estate planned or no will. The court did enter an order requiring her to produce either her will or an affidavit by the preparer that it no longer existed. Once again, she didn't either. So how am I to meet my burden of persuasion? I asked the court- How does the will, how does this establish a resident continuing tangible relationship? I mean, I'm trying to call out, because when we announce a rule, a statement of law, it applies to all cases, not just this case. And I was struggling with your two different states. You could have this resident tangible relationship. So two people, the facts are clearly maintaining two different residences. They get together once in a while. They have an intimate relationship. The person gives them life insurance, pays expenses, but actually is only in town a few times a year and lives in another state. According to you, that fits the definition of a resident tangible continuing relationship, right? Plus the life insurance, Your Honor, and the tenants in common with rightful surrendership. It's providing for that significant other after demise. I think that's one of the defining characteristics. De facto husband and wife relationship is caring for that person after- Is it just a de facto husband and wife relationship, or is it a resident continuing tangible relationship? Well, Your Honor, the 510C speaks in terms of a resident continuing tangible relationship. However- Not a de facto, no. While you're in remarriage of Cardona, which is the second district case from 1990, the court stressed that the question is whether it's a de facto marriage. And the inequities are there to the payor's spouse. When the wife is engaged in a relationship, though not formalized with marriage, that bears all of the indicia of a de facto husband and wife relationship. Well, couldn't you have a de facto husband and wife? Couldn't you have a relationship where this guy is enamored with somebody? You've seen it happen. It could be sending them money and totally supporting them and leaving the estate to them and never see them face to face. And that's a tangible resident relationship? Under the statute, I believe it is, Your Honor, based upon the changing nature of relationships, especially with Skype and mobility. You're correct. There's no physical contact. Right. The case so long ago abandoned the, how do I delicately say, the relations part of it. As a matter of fact, if I'm not wrong. So the level of financial support is going to determine whether there's a resident tangible. Somebody could be living in Europe and you're going to argue to us it's a resident tangible continuing relationship? Yes, Your Honor, because of the economic reality of the situation, which is the real test, not whether they're engaged in relations. So the plain meaning of the words resident tangible don't matter? Well, of course they matter, Your Honor. They're in the statute. But how could they if the financial aspects are the key consideration? Exactly, Your Honor. It's the economic realities of the situation, whether he or she provides for the other, including after their demise. That's what I believe is the defining characteristic of a de facto husband-wife relationship. What about the second issue? Oh, the second issue. The court retroactively interpreted sua sponte without request by either party, a 2005 order. The husband was required to pay a dollar amount, fixed dollar amount, and 35% of any incremental increase in his base income. The court interpreted that to mean 84% of the corporation's revenues. Sua sponte? Sua sponte. There was no testimony. So is that, in your conclusion, is the prayer relative to the second issue that we vacated and remanded back for an actual hearing, where the trial court rules consistent with the arguments and the proofs of both parties? Well, Your Honor, we're dealing with the language in the agreed order from 2005. And I think this court can certainly interpret it on the four corners of the document, what 31% of any incremental increase in base. At least that way the trial court would have some kind of direction, as opposed to saying we're just going to take 84% of whatever the corporation earned. The trial court didn't say, oh, I'm going to disallow depreciation, which they could have done. Or else they're going to say, oh, I'm going to disallow office expense. I'm going to disallow travel. They didn't do that. It was just, ah, 84%. And you get a judgment. Especially when it wasn't plain. That's why we're asking at least that part to be reversed. And hopefully given the directions, if the court can't de novo, review the four corners of the 05 agreed order. There's an agreement here. I thank you. Thank you. You'll have an opportunity to make your vote. Mr. Douglas. Are you married, sir? Yes, sir. Do you spend two hours every day talking to your wife? On the weekends, yes, sir. Mr. Kowalski raises an interesting point, which is whether e-mails should be made a second factor in determining whether or not there is a de facto marriage or conjugal relationship. Apparently because depending on what the e-mails contain, they may be evidence or proof of something that would suggest that maintenance is no longer required. Well, in answer to that, I would say that as part of what a court has to look to in determining whether or not there's a de facto husband-wife relationship, a court can look to the communications between the parties. They can look to them. Is there a negative inference to be drawn from the fact that there was not compliance with those court orders? Well, in connection with those court orders, my recollection is that they related to allegations regarding that there was a non-production of an estate plan and there was non-production of e-mails. Regarding the non-production of an estate plan, there's evidence in the record from Teresa that there was no estate plan to produce. So there's nothing there for this court's negative inference to be drawn. With respect to the e-mails, there are some, in my recollection, as e-mails produced in the record. To the extent that there were not e-mails produced in the record, at trial there was a motion in limine filed alleging that non-production, non-compliance to the orders. The court did find that that motion in limine, excluding evidence or barring evidence because there were e-mails not produced, was to be denied. The trial court denied that motion in limine. The standard of review of this court is to apply to whether or not you're going to reverse in connection with the motion in limine is did the trial court abuse discretion? And I would assert that there is little evidence in the record what the e-mails would have showed other than conjecture, no offer of proof, and there's nothing before you that would lead you to believe that the trial court abused discretion in denying the motion in limine. So there was no offer of proof to provide somewhere in the record what these e-mails would have shown or what they were going to establish? No. Counsel suggested that here and I think there what she thought or hoped they would show, but my recollection of the record is that that does not amount to an offer of proof made before the trial court regarding what the e-mails would show as between the parties. Regarding the case. I think it's $375 in rent that was supposedly paid every month. My recollection of that is that related to either a rental and or the repayment of a loan. There is some testimony I believe from both Teresa and me regarding that issue. And it would be my position that that whatever that financial interaction was, does not rise to the level of any proof or addition that there's a de facto husband wife relationship between Teresa and Mr. I'll pronounce his name. You agree with Mr. Kowski that the trial courts who respond, they came up with the 80 some percent on the urge. Now, the way that the trial court calculated what was was as follows. Well, let's let's it was a two part question. I'm sorry. First part first was what the trial court did. So a spot there was it done based upon arguments or petitions of parties? It was not done to respond to because the judge's order was issued as a consequence of a petition for rule to show cause filed by Teresa. So in that sense, it was not to respond to. It was that hearing pursuant to that petition. We heard in the methodology and a petition to show cause related to what? What? What? That there was an increase in the amount of income in the corporation and therefore there was an increase in the amount of income of the husband. Yes. And to further answer your prior question. What the record shows is that the methodology for the trial court making its determination was as follows. There was an order entered on July the 20th of 2005. It is an agreed order. So this is something that William himself participated in. You cannot now complain of its methodology. It set out that at that time, his closely held corporation, which is in effect him, CX, if I'm pronouncing that correctly, was $12,500 monthly. That his income from that was $10,500. So what the court agreeing with trial counsel, I was not the trial counsel, by the way. What the court did agreeing with trial counsel was determine that he essentially stipulated at that time his income is 84% of that corporation's income. William introduced into evidence tax returns for the years 2005 through 2008 regarding the corporation's income. So using that initial agreed order where he stipulates that his income is 84% of the corporation's income, the court went forward and generated and accepted the trial attorney's calculations regarding what his income should be for those years. It looked at what maintenance would be due as a consequence. Took into account the payments that he made. And from there the court took into account what? The payments that he did make. There were periods of time when he didn't make payments due to the allegations of cohabitation. The trial court found that he did that at his peril. But there were times when he didn't make payments. So he did get credit for the payments made. And that was the manner in which the arrearage was determined. Well, did the tax returns show a different percentage between what he claimed his income was and what was 87% of the income of Sykes? He did argue. He argued that point, yes. So the tax returns would not have yielded that figure. In answer to that, before this court, I have cited the McDonald case. That was a dissolution proceeding. The payor was a farmer, essentially. And in that case, the court determined that tax returns certainly are admissible. And I'm not arguing they're not admissible. In fact, they are, to the extent they recite gross income, they're the basis for the arrearage. But the court in McDonald found that tax returns are much less than conclusive in determining cash flow, ability to pay. The court found that income can be shielded from taxation. And most importantly, the court in the McDonald case found that if a spouse is alleging something regarding his income or claiming inability to pay, that something more than a copy of a tax return is necessary to establish a preponderance of the evidence. There, the court opined that perhaps expert testimony would be required in connection with establishing what actual net income. Well, you could also do that through business records, right? Absolutely. All right. So whose burden is it here? Once there's been a perinatal facial case made, there's a petition for a rule to show cause. Whose burden, then, is it to produce those records? Does your client have to ask for them, or does he have to tender them to substantiate what his claim of net income is? In an indirect civil contempt proceeding, the burden that Teresa had was to demonstrate the obligation that William was out. The fact that he hadn't paid. Right. Well, there was an obligation, so the order establishes the obligation. Once a rule issues, then it becomes incumbent upon the then-contemnor to establish that he didn't comply with the order. No, but can he just stand before the trial court and say, okay, Judge, well, here's my net income? No. Is it her responsibility to say, hey, I want your business records that substantiate what you're claiming your net income is? No. It would be my position that the trial court did not err in what was put on by her, and to the extent that she did put on evidence, namely, that there was an obligation that per that 2005 order, his income was 84% of the corporation income, and here was the income of the corporation in subsequent years. By doing that, she put on what she needed to put on to establish that there was a sum due and that there was an underpayment. What did the tax return show? Wasn't there some reference in the Mural Settlement Agreement about the tax returns would provide the evidence of this? The Mural Settlement Agreement related to a previously established support obligation. The Mural Settlement Agreement are related to obligation on the part of willing to pay something like in excess of $5,000 a month. The petition for rule to show cause was not directed against noncompliance with the settlement agreement. The petition for rule to show cause was directed as against... 2005 order. Right, and that does differ. Whichever way that cuts, that does differ from the way maintenance is to be paid pursuant to the judgment. How is it going to be established? Wasn't there some reference somewhere about that being initially established with the income tax returns? In the judgment? Whatever that we're going to try and, you know, if there's going to be an increase, wasn't the tax returns to the parties to be looked to? They were. So what I would argue is that the tax returns were utilized in the case to establish what the gross income was. The court did not... Correct? The trial court saw the tax returns, right? Right. From the tax returns of the corporation is how the error was calculated. So to the extent that William asserted the gross income of my corporation is only this, to that extent they were accepted. The court did not impute income. The court did not find they were more than he said. The court did not accept at base value his argument as to his self-declared none. And I've cited cases before the court regarding that issue. So the court took the gross income contained in the corporate tax returns and then applied the 80-some percent? Yes. And what is the rationale for concluding that the 80-some percent was still applicable, that things hadn't changed? Why was it reasonable for the trial court to assume that that percentage was static? Because there was no evidence to the contrary. William could have, in addition to the tax returns, produced concrete evidence rather than his summary as to what he believed his net income is. I've cited to this court the Loeffler case. And in that case it was a self-employed person. And in that case the trial court found, looking at the total income, 40 percent is what we think the overhead is. And in that case the Loeffler court found, quote, while a more exact calculation of net income than the 40 percent figure may have been preferable, we do not believe it is an unreasonable figure. While 40 percent off gross and 80 liberal, it is not an abuse of discretion. So my further answer to you is, is the trial court's methodology, even if it would assume a static, if you will, net, meaning year one 80-something percent, year two 80-something percent, year three 80-something percent, absent any contrary evidence, it is reasonable. Just as in the Loeffler case, it seems to me from that decision even more inexact when the trial court found 40 percent. The question is, is what the trial court did in determining what the net is an abuse of discretion? And when the static or not, when the basis is an agreed disposition by him, it is certainly not an abuse of discretion. And it would have been incumbent upon William to present or ask to present or ask to reconsider further or additional information regarding his actual expenses, whether that be by ledgers, bank account statements. The cases cited previously noted that perhaps this is something that can be accomplished by expert testimony. Further, I cited additional cases. I cited the Carpell case, and that case was a child support increase case. I realize this is not a child support case, but on appeal, the opposing party did reference that this court looked to child support cases. And in the Carpell case, that case was an attorney, if I'm recalling correctly. He was self-employed. And the court found the tax-reported income is not conclusive evidence of either gross or net, and I think that is an including answer to your prior inquiry. And the court further found there that guidelines and deductions from business income have different policies in connection with what you're looking to in the tax code. Counsel, since you won't have the chance to address this again in rebuttal, I'm just getting back briefly to the first issue. We sort of jumped ahead into the financial aspects. Can you tell us succinctly why the evidence does not establish that they were living together on a resident mechanical basis? Obviously, you're asking us to uphold the trial court's determination. Yes. Okay. Tell us succinctly why that decision is correct, why they were not living together on a mechanical basis. Okay. The court, this court, should recognize that there was not a decision made in contrary to the manifest way of the evidence because what the evidence essentially showed is a business relationship between the two parties. And most of the record, frankly, if you look at it, relates to attempts to prove something regarding the Florence Street property or Golden Valley Realty or Bossick Sunshine or whatnot. It is extremely convoluted to follow, and the trial court did a very good job of distilling it down in its findings. Keep going. Okay. Essentially, what you had and what I think the evidence showed is you had people who knew each other when they were younger. Teresa had been awarded property in North Carolina, so she went to live there. Sometime after, Lee went to live in North Carolina. They had a business relationship, third parties, and there were five witnesses from North Carolina who recall what they observed in looking at these two people as simply a business relationship. There was not discussion of marriage between these two parties, and that's something the court can look at. The best that they have is what the trial court described as sparse intimate relations. Sparse intimate relations isn't enough to prove a de facto husband-wife relationship. There's cases that have said that state that the law is that even a dating relationship isn't enough to prove a de facto husband-wife relationship that rises to the level of terminating maintenance. Mr. Jankowski said that your client, pardon me, the third party visited your client's residence on a daily basis. I do not believe the evidence. That's what I thought you said. It may have been. Did she not have some sort of partitioned area in a building that might have been an office building that he might have gone to do business almost on a daily basis? It was a business property. Might qualify for him being in the same place? In the same... Oh, not in the same partition? Street address. But there was testimony by Teresa that at times that he had been there is in a separate location within that street address. And I will defer to the record. I believe it's that foreign street property that gets referenced, if I'm recalling correctly. But the net-net is that after a period of time, he moved away. He visits there infrequently. And looking to these several factors that relate to cohabitation. Did she rationalize the depreciation on the vehicle owned by the third party on her tax return? I honestly don't recall that one. I do recall, though, the testimony being that regarding the vehicle, that because there was involvement in a realty business, that that vehicle was necessary to travel to the locations where the undeveloped property might be had. There were interrelated business interests, and I'm not disputing that. I mean, I'm deferring to the trial court findings in that regard as well. But all they actually proved is a business relationship. Any other questions? Thank you, sir. Okay, thank you. Ms. Kowalski, I'm sorry I called you Jan Kowalski. It's Jan Kowalski, so I'll take that. I will be very brief and succinct, at least I hope. The parties, not the parties, the third party and the payee discussed that they couldn't get married. So is that discussing marriage? I think that's parsing words. The suggestion that they had a business, I don't think that really helps the court's finding if it was a de facto husband and wife, because essentially this country was built upon mom and pop businesses. The fact that two people have a business together does not preclude a resident continuing a conjugal basis. And, you know, I had to look back at my notes, and there is a fourth district case from 1994, which essentially says that you don't have to reside any longer, which is, in that case, the parties saw each other every day, but they never stayed overnight. So the old wisdom that it's not resident. Was that the case where the man went home at 1030 every night? Exactly right. That's Inmate Manager Herron, Fourth District, 1994. Right after the news. Exactly. But there were reciprocal will provisions, and that's provided at the orders at Appendix 13 in my brief, Your Honor. The court didn't deny the motion of elimination. She took it with the trial. She said that she'd heard enough and she didn't need more records from Google. The court did make a sua sponte ruling, and you can see that in my appendix at page 17. The court literally said, come back to me with calculations as to how much you owe. I don't think that's the quite burden of proof for failure to abide by court order. If the court order isn't clear on his face, you can't say, prove to me how much in contempt you are. But anyways, we did that, and we provided Petitioner's Exhibit 4, which provided that from 05 through essentially part of the year 10, that was our trial, that my client's salary ranged between $125,000 and $150,000 a year, and he paid maintenance of $43,000 to $30,000 per year. So I don't see how the court could sua sponte. This was never addressed. No one suggested that there was an ambiguity. What is your response to Mr. Douglas' statement that the trial court based its rationale on the prior agreed order that came up with the percentage in the prior order and then applied it to the arrearage later on? I don't see how he even makes that argument. It honestly doesn't make sense to me, Your Honor. But I know on my appendix, page 15, that there was an August of 10 order that was entered requiring 2583 plus 31% of the bonus. Now, in going back to interpret the 05 order, how could the court not look at the August 10 order, which said that 31% means 31% of incremental increase is 31% of the bonus. I don't see how the court in interpreting the 05 order could avoid the August of 10 order, but it did. Did your client have the obligation to substantiate his claim of net income by tendering the business records that would substantiate that claim? Yes, clearly he did. It was required to in the marital settlement agreement, and he did. Did he just tender his income tax return, or did he tender the underlying documents that would support his claim of those business deductions? Corporate and personal, Your Honor, and also the business records, in other words, the business check income records. So if you're asking for canceled checks, I'd have to look at the record to see whether or not they're included on the statement. But our client did fully produce everything. When you say canceled, you mean paid, don't you? Sometimes the statements of account would show the payees on the canceled check on the statement. So I'm not sure. I don't remember. This is going back to 10, whether those actual canceled checks. But if we'd been requested to produce it, we would have produced it, because I know for a fact we did produce the personal and corporate tax returns from 05 through 10. Was that requested, though? My understanding was that she did not request the underlying documents that would support those deductions. You're right, Your Honor. She didn't request that. So you didn't tender? Well, we did tender the documents. I don't want to have to sparse words, because we did produce his personal and business tax returns and also his checking account statements, business and corporate. When you say you produced, are you talking about you produced them or you submitted them to the trial judge for consideration? I produced them to opposing counsel. And also that's required pursuant to the settlement agreement is he has got to give his tax returns, which he did. They're admitted as Petitioner's Exhibit 4. Well, you said that the trial judge said send me your statistic to show what the rearage is, and did you do that? Yes, Your Honor, we did. And what was it that you sent to him to establish what you thought the rearage was? Let's see if that's in the record. I did submit a document. I'm hoping it made it into the record, and I can certainly provide it to the court. Don't worry about it. Keep going. I would have to find it in the record. But it was after the rule was entered and the purge was set. And then we did a motion to consider, asking the judge at least give us some kind of indication as to if you're going to disallow travel, entertainment, fine. But you didn't say 84% of the business income. We need more direction. That's why it's very difficult to, especially when that August 10th order says it's 31% in bonus. Thank you, Your Honor. Thank you. Thank you. Thank you. We'll take the case under advisement. Court is adjourned.